IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHAL DIVISION

| | | |
|---|---|---|
| CALVIN GARY WALKER, | § | |
| WALKER'S ELECTRIC, WALKERS | § | |
| ELECTRIC | § | |
| | § | |
| Plaintiffs, | § | **CIVIL ACTION NO. _____** |
| | § | |
| v. | § | |
| | § | JURY TRIAL |
| IBEW, IBEW 479, Beaumont | § | |
| Independent School District, Wayne | § | |
| Reaud, *et al.* | § | |
| | § | |
| Defendants. | § | |

## ORIGINAL COMPLAINT

### I.   JURISDICTION

1.     The court has jurisdiction over the lawsuit because the action arises under U.S Const. amend. XIV.

2.     The court has jurisdiction over the lawsuit because the action arises under 42 U.S.C. § 1983.

3.     The court has jurisdiction over the lawsuit because the action arises under 18 U.S.C. § 1982 et seq.

### II.   VENUE

4.     Venue is proper in this district under 28 U.S.C. § 1391(1)(b)(1) because several defendants reside in this district, and all defendants are residents of Texas.

5.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this district.

### III.   PARTIES

### A.  Plaintiffs

6.      Plaintiff Calvin Gary Walker is a resident of Beaumont, Texas, and can be served through counsel of record.

7.      Plaintiff Walker's Electric is a company incorporated in Texas, doing business in Beaumont and elsewhere in Texas. Its main office is in Beaumont, Texas. Walker's Electric can be served through counsel of record.

8.      Plaintiff Walkers Electric is a company incorporated in Texas, doing business in Beaumont and elsewhere in Texas. Its main office is in Beaumont, Texas. Walkers Electric can be served through counsel of record.

### B.  Defendants

#### i.    BISD Employees

9.      Defendant Beaumont Independent School District (BISD) is a school district in Beaumont, Texas, and can be served through its Superintendent, at 3395 Harrison Avenue, Beaumont, TX 77706 or other appropriate address.

10.      Defendant Aaron Covington was a BISD employee, Director of Contracts and/or Contract Supervisor, or similar function, at BISD, and can be served at 1516 S 27th St., Apt. 124, Nederland, TX 77627 or other appropriate address.

11.      Defendant Leroy Saleme was a Chief Financial Officer at BISD, and can be served at 7455 Calder Avenue, Apt. 6, Beaumont, TX 77706, or 5090 Oakmont Drive, Beaumont, TX 77706.

12.      Defendant Vernon Butler was a BISD employee serving as Superintendent, and can be served at BISD, 3395 Harrison Avenue, Beaumont, TX 77706.

13.     Defendant Jane Kingsley was Chief Financial Officer for BISD and can be served at 5008 Spearman Drive, College Station, TX 77845.

14.     Terry Ingram is and was a BISD employee and can be served at 12131 Bryant Drive, Frisch, TX 75034 or other appropriate address.

### ii.     BISD Board of Trustees

15.     Defendant Michael "Mike" Neil was and still is a member of the BISD Board of Trustees and can be served at BISD, Board of Trustees, 3395 Harrison Avenue, Beaumont, TX 77706 or other appropriate address.

16.     Defendant Tom Neild was and still is a member of the BISD Board of Trustees and can be served at 3395 Harrison Avenue, Beaumont, TX 77706 or other appropriate address.

### iii.     BISD Board of Managers

17.     Venice Monroe was and still is a member of the BISD Board of Managers and can be served at BISD Administration Bldg., 3395 Harrison Ave., Beaumont, TX 77706 or other appropriate address.

18.     Defendant A.B. Bernard was and still is a member of the BISD Board of Managers and can be served at BISD Administration Bldg., 3395 Harrison Ave., Beaumont, TX 77706 or other appropriate address.

19.     Defendant Jimmy Simmons was and still is a member of the BISD Board of Managers and can be served at BISD Administration Bldg., 3395 Harrison Ave., Beaumont, TX 77706 or other appropriate address.

20.     Defendant Robert Turner was and still is a member of the BISD Board of Managers and can be served at BISD Administration Bldg., 3395 Harrison Ave., Beaumont, TX 77706 or other appropriate address.

21.     Joe Domino was and still is a member of the BISD Board of Managers and can be served at BISD Administration Bldg., 3395 Harrison Ave., Beaumont, TX 77706 or other appropriate address.

22.     Lenny Cabarello was and still is a member of the BISD Board of Managers and can be served at BISD Administration Bldg., 3395 Harrison Ave., Beaumont, TX 77706 or other appropriate address.

23.     Jack Carroll was and still is a member of the BISD Board of Managers and can be served at BISD Administration Bldg., 3395 Harrison Ave., Beaumont, TX 77706 or other appropriate address.

### iv.     Beaumont Examiner

24.     Defendant The Beaumont Examiner is located in Beaumont, Texas, and can be served through its registered agent, Don Dodd, at The Examiner Corporation, 470 Orleans, #1006, Beaumont, TX or other appropriate address. Defendant The Beaumont Examiner is being sued directly and vicariously for the actions of its agents.

25.     Don Dodd, agent of the Beaumont Examiner can be served at The Examiner Corporation, 470 Orleans, #1006, Beaumont, TX 77701 or other appropriate address.

26.     Jennifer Johnson, agent of the Beaumont Examiner can be served at The Examiner Corporation, 470 Orleans, #1006, Beaumont, TX 77701 or other appropriate address.

### v.     Beaumont Enterprise

27.     Defendant Beaumont Enterprise is located in Beaumont, Texas, and can be served at The Beaumont Enterprise, 380 Main Street, Beaumont, TX 77701. Defendant Beaumont Enterprise is being sued directly and vicariously for the activities of its agents.

28.     Defendant Brooke Crum is a writer for the Beaumont Enterprise and can be served at The Beaumont Enterprise, 380 Main Street, Beaumont, TX 77701 or other appropriate address.

### vi.     IBEW

29.     Defendant the International Brotherhood of Electrical Workers (IBEW) can be served at their National Union Site, located at 1445 N. Loop W #400, Houston, TX 77008 or other appropriate address. IBEW is being sued directly and vicariously for the actions of its agents.

30.     Defendant the International Brotherhood of Electrical Workers Local Union 479 (IBEW 479) can be served at 1430 Spindletop Ave., Beaumont, TX 77705 or other appropriate address. IBEW 479 is being sued directly and vicariously for the actions of its agents.

31.     Defendant Steven Lisle can be served at IBEW 479, 1430 Spindletop Ave., Beaumont, TX 77705 or at his home address or other appropriate address.

32.     Dwayne Hermann can be served at IBEW 479, 1430 Spindletop Ave., Beaumont, TX 77705 or at his home address or other appropriate address.

33.     Chris Kibby can be served at IBEW 479, 1430 Spindletop Ave., Beaumont, TX 77705 or at his home address or other appropriate address.

34.     David Gonzales, business manager for IBEW 479, can be served at IBEW 479, 1430 Spindletop Ave., Beaumont, TX 77705 or at his home address or other appropriate address.

35.     Defendant Wayne Reaud is a resident of Beaumont, Texas, and can be served at 1315 Audubon Pl, Beaumont, TX 77706 or at 801 Laurel Street, Beaumont, TX 77701 or other appropriate address.

### vii.     Individual Members of the Conspiracy

36.     Michael Getz is an attorney in Beaumont, Texas, and a member of City Council. He can be served at Beaumont City Council, City Hall, 801 Main Street, Beaumont, TX 77701 or at 1335 Broadway Street, Beaumont, TX 77701 or other appropriate address.

37.     Cory Crenshaw was a prosecutor in the AUSA's office, a prosecutor in the Jefferson County District Attorney's office, and is currently residing in Jefferson County. He can be served at 8009 Gladys Avenue, Beaumont, TX 77706 or other appropriate address. Crenshaw is being sued individually and in his official capacity.

38.     Malcolm Bales, is the U.S. Attorney in the Eastern District of Texas and can be served at the Attorney's Office for the Eastern District of Texas, at 350 Magnolia Avenue, Suite 150, Beaumont, TX 77701 or other appropriate address. Bales is being sued individually and in his official capacity.

39.     Jerry Jordan is a journalist for SETInvestigates.com residing in Jefferson County. He can be served at Jerry Jordan's Southeast Texas Investigates, 95-B W. Chance Road #183, Lumberton, TX 77657 or other appropriate address.

40.     Jonathan Cassidy is a writer for the online publication Watchdog.org. He resides in Jefferson County. He can be served at 1469 Interstate 10 E, Beaumont, TX 77701 or other appropriate address.

## IV.    DEFINITIONS

41.     The plaintiffs listed in paragraphs 6 through 8 are collectively referred to as Walker.

42.     The defendants listed in paragraphs 9 through 28 are collectively referred to as BISD Agents.

43.     The defendants listed in paragraphs 29 through 35 are collectively referred to as the IBEW Agents.

44.     The defendants listed in paragraphs 9 through 40 are collectively referred to as the Conspiracy.

## V.     FACTS

### A.  Mr. Walker Refuses IBEW's "Offer" for Protection, Earns BISD's Business, and Seals His Fate.

45.     Mr. Walker is the owner of Walker's Electric Company (Walker's Electric) and is a Master Electrician. He started Walker's Electric in 1996 and he became a Master Electrician in 2004. Mr. Walker built a successful business over the past two decades, serving communities in and around Jefferson County. Mr. Walker served the Beaumont community for years. He offered reliable and affordable electrical services. He would at times provide services to BISD, among others, and not request or receive payment. Mr. Walker is dependable and hard working. He started with no employees, but eventually was able to generate enough business to support fifteen employees. Unfortunately, due to the Defendants' actions, Walker now only has two employees and Mr. Walker working for it.

46.     Shortly after obtaining his Electrical Contractors License, Mr. Walker was approached by IBEW 479 members and asked to join the union. In particular, Chris Kibby and Danny Prospie, two IBEW 479 members, asked Mr. Walker to join them. Mr. Walker declined. Later, during a phone call by Mr. David Gonzalez and Chriss Kibby, both talking to Mr. Walker as IBEW members, Mr. Gonzalez told Mr. Walker that they would "get him one way or another." This is a classic shakedown or, in common parlance and statutory construction, "a racket." Mr. Gonzalez and Mr. Kibby were using interstate methods of communication to make these threats.

47.     In approximately 2006, despite IBEW 479's and IBEW's best efforts to stop Mr. Walker, BISD awarded Walker a contract for providing BISD with electrical maintenance and repair services. Unfortunately for Mr. Walker, this contract had previously been held by an IBEW 479 member company. Not only that, by obtaining the electrical services procurement contract, Mr. Walker put an end to IBEW 479's 37-year streak of having member companies offer services as BISD's electrical service providers. For two years, Mr. Walker delivered services to BISD without fail and at lower cost than his IBEW 479 counterparts.

### B.  IBEW, Through Co-Conspirators, Increases its Racketeering Activities.

### 1.  The TDLR Investigation

48.     On April 17, 2008, Steven Lisle of IBEW 479, acting in his capacity as Assistant Business Agent IBEW 479, began implementing IBEW 479's plan and filed a complaint with the Texas Department of Licensing and Regulation (TDLR) alleging Mr. Walker's license was obtained by fraud. Ex. 1 Initially, TDLR was able to confirm Mr. Walker's representations and affirm the veracity of every document submitted by Mr. Walker. *Id.* But Defendant Lisle would have none of it. Defendant Lisle communicated with the TDLR investigator on May 5, 2008 and on June 11, 2008, sending faxes and emails in the interim. Ex. 1. During the investigation, the TDLR investigator contacted the owner of Bayou Electric's, one of Mr. Walker's previous employers. Defendant Lisle was adamant that Mr. Walker had not worked for that company the number of hours reflected in his application. However, Bayou Electric's owner, Mr. Tommy Vice, confirmed that Mr. Walker had in fact worked for him. He then added that, "it is unfortunate that the local Union 479 is not happy with Respondent [Mr. Walker] and is making complaints against Respondent [Mr. Walker]." Ex. 1 at 7. Mr. Lisle was also adamant that Mr. Walker did not work for "Network Electric." TDLR confirmed that Mr. Lisle's assertions were wrong.

49.     In January 2009, the investigation was still underway. Mr. Walker, during one of his communications with TDLR, stated that the "union filed th[e] complaint because he will not join the union." Ex. 1 at 16. In March 2009—nearly a year after Defendant Lisle filed his complaint against Mr. Walker—the Conspiracy finally got what they needed. The TDLR investigator called a notary who acknowledged notarizing an affidavit (that was relevant to Mr. Walker obtaining his license). Ex. 1 at 18. The notary described the affiant, Mr. Jones, and stated he was present when she notarized the affidavit. *Id*. She also gave a physical description of Mr. Jones that matched the one Mr. Walker gave. *Id.* at 17-18. Unfortunately for Mr. Walker, Mr. Jones was a union member—a member of IBEW 479, to be precise.

50.     Emails from Defendant Lisle and records of TDLR's investigation through the Spring of 2009 reflect the fact that Defendant Lisle was highly preoccupied with making sure Mr. Walker's license was revoked. Ex. 1 at 10. He provided names and phone numbers of individuals who could discredit Mr. Walker to TDLR. *See, e.g.*, Ex. 1 at 10. On February 26, 2009, for example, he wrote to the TDLR investigator an email with the Subject: Walker Investigation, and asked, "How is the investigation doing, do you need any other information?" Ex. 1 at 12.

51.     <u>Three</u> weeks after TDLR's conversation with the notary, the TDLR investigator contacted Mr. Jones to ask him to corroborate the notary's statements. *Id*. Mr. Jones did an about face and stated he had never signed the affidavit and that he had not worked with Mr. Walker in Nevada—as represented on Mr. Walker's application. *Id*. Upon hearing this, Mr. Walker immediately stated that IBEW was scaring electricians into saying things to harm him (much as they had tried to scare him into joining). Ex. 1 at 5. Five days after that conversation, on April 27, 2009, Defendant Lisle hand-delivered documents to the TDLR investigator confirming that Mr. Jones had been an IBEW member in Nevada and was accepted as a member of IBEW 479 on

November 3, 1998. Defendant Lisle also told the TDLR investigator that, "Mr. Walker gets most of the bids especially from the district since he is the lowest bidder." *Id*. at 18. Defendant Lisle added that, "Walker leaves some jobs incomplete and that some of his work is not to code." *Id*.

52.     On April 28, 2009, the TDLR investigator again contacted Mr. Vice, owner and master electrician with Bayou Electric. Mr. Vice again confirmed that Mr. Jones had worked for him in Nevada, that he had hired Mr. Walker, and that, "all of this involving Calvin Walker came about due to the Union giving them [sic] a hard time." *Id*. at 19. Mr. Vice confirmed that Mr. Jones had worked for him at Bayou Electric and that he had hired Mr. Walker to also work for him at Bayou Electric. Mr. Vice then added that he had dropped out of the union and that they had "tried to mess with him but he had been in business too long that they have left him alone." *Id*. at 19.

53.     In an effort to put this behind him, Mr. Walker agreed to a fine, relinquished his Master Electrician license, with the understanding he would be able to immediately get it back without taking the test and using the same hours he had already earned for his old license. Mr. Walker, a capable and qualified individual, did in fact re-take the test and regain his Master Electrician License within a year. Unfortunately for Mr. Walker, this set of events surrounding the TDLR's investigation of Mr. Walker's license would be used and re-used by IBEW and the Conspiracy to harm Mr. Walker's reputation. For example, in a 2010 interview, Defendant Gonzales, business manager for IBEW 479, told reporters that, "the union has had questions for a long time about Walker's qualifications and why he was winning so many contracts to do school district projects." Ex. 25. The article also falsely reported that Mr. Walker had admitted to "falsifying" his application for a Master Electrician's license. *Id*.

54.     This would not be the first time that IBEW's activities resulted in a slew of false accusations that Mr. Walker "falsified" something. Having failed to take his credentials, IBEW

Agents, with the help of the Conspiracy, moved on to taking Mr. Walker's good name, thereby ruining his business.

### 2.   IBEW Agents and BISD: Formation of the Conspiracy.

55.     BISD held Executive Cabinet meetings once a week from at least 2006 to 2010. The individuals at those Executive Cabinet meetings were Jessie Haynes, Jane Kingsley, Chief Financial Officer for BISD, Superintendent Dr. Carroll Thomas, Terry Ingram, Dr. Shirley Bonton, Sybil Comeaux, as Executive Director of Personnel, and Dr. Timothy Chagois. The group would meet to discuss day to day operations. Walker was a constant topic of discussion.

56.     Starting in 2006, Terry Ingram would make comments to the effect that the IBEW did not like Mr. Walker having the contract, that Mr. Walker was a sloppy business man, and that he was not keeping appropriate records for his services. Mr. Ingram had no basis for his comments other than IBEW 479's position regarding Mr. Walker's abilities. Dr. Thomas would first note that BISD was not beholden to IBEW 479 and was entitled to hire contractors who complied with BISD's requirements and criteria. Further, upon questioning by Dr. Carrol Thomas, Mr. Ingram would admit that Mr. Walker was meeting BISD's criteria and performing adequately under the terms of his contract.

### C.  BISD's "Blacks Only" Contracting & Invoicing Requirements.

57.     During the same time period, starting in 2006, Jane Kingsley, BISD's CFO, would come to the Executive Cabinet meetings with spreadsheets reflecting Walker's Electric work. Ms. Kingsley would review each of the expenses with a fine tooth comb. Ms. Kingsley never produced these types of spreadsheets and never performed a cost analysis on *any other contractor* other than Walker's Electric.

58.     In approximately 2008, at the end of the two-year contract, BISD put out a bid request for the same electric services that Walker's Electric had been providing. However, BISD through Ms. Kingsley, did three things to ensure Mr. Walker would not be able to continue his work for BISD. First, BISD put out the bid request for the job earlier than it usually did, to the tune of three to five months. Second, BISD did not publish or advertise the bid request as it was supposed to. Rather, BISD sent out bid request packets to a number of contractors. However, and this is the third measure BISD took to ensure Mr. Walker would not get the contract, BISD sent the bid packet to all contractors *except* Mr. Walker—the service provider at the time.

59.     Certain individuals, realizing the inappropriateness of these activities, contacted BISD's Finance Office and asked about the reasons for doing this. The Finance Office admitted the irregularities but described them as a mere "oversight." Dr. Caroll Thomas, BISD's Superintendent at the time, requested that the Finance Office re-initiate the procedure correctly. BISD's Finance Office obliged.

60.     Having then been given the same opportunity as everyone else, Mr. Walker— again—came in as the most qualified and lowest bidder. And despite opposition by the Board of Trustees, Mr. Walker was able to win the contract, once again. However, BISD, IBEW, and their allies were not done with Mr. Walker.

61.     The BISD Finance Office, through its CFO, imposed onerous invoicing and recordkeeping requirements on Mr. Walker—and other minority-owned businesses—that it did not impose on businesses owned by whites. For example, Mr. Walker had to submit line by line invoices as well as receipts. These requirements were not imposed on any other Caucasian-owned businesses providing time and material services to BISD. The detailed invoices and receipts were

then used in newspaper articles to parse Mr. Walker's work, and eventually were made the basis of the Government's failed prosecution of Mr. Walker.

62.     In 2010, Mr. Walker was poised for more racially based efforts to thwart his ability to re-bid the contract. However, most likely sensing they were being watched, the BISD Board of Directors as well as the Finance Office, allowed the process to take place without incident. Mr. Walker, again—having been given the opportunity to compete on a level playing field—submitted the lowest bid by the most qualified company. BISD awarded Mr. Walker, via Walkers Electric, the contract for electrical maintenance and repairs.

63.     When the Contract was improperly terminated, without notice, by BISD, and awarded to a white union electrical contractor, BISD policy regarding invoicing abruptly changed. BISD stopped requiring receipts and other supporting documentation prior to paying invoices. When employees protested at the unfairness, and continued to submit invoices accompanied with receipts, the BISD financial office responded to stop doing that because receipts were no longer needed. As a result, the only electrical contractor that BISD required to submit invoices and receipts was Mr. Walker—a black non-union electrician. Such activity was in furtherance of the conspiracy and a violation of Mr. Walker's constitutional rights.

**D.  Mr. Walker's Indictment.**

64.     IBEW members, including Dwayne (Duwayne) Hermann, seeing their efforts to interfere with Mr. Walker's business thwarted, turned to allies Defendant Crenshaw and Defendant Bales for assistance. In May 2011, the federal government indicted Mr. Walker on 37 counts of fraud relating to his work for BISD. The AUSA's office purportedly worked with BISD to prosecute Mr. Walker. Indeed, BISD's lawyers sought to recover attorney's fees from the Federal Government because of their assistance in gathering information and witnesses for the

Government's prosecution of Mr. Walker. (The Court declined to grant BISD's attorney's fee request). On the other hand, BISD employees repeatedly testified that Walker did no defraud BISD and that to the contrary, Mr. Walker repeatedly gave labor and services to BISD for free.

65.     In December 2011, Mr. Walker was tried for his alleged fraud on BISD and the Government was unable to obtain a conviction. Faced with the option of re-trying Mr. Walker, but the very real possibility that the Government would be unable to make its case—again—the Government offered Mr. Walker a plea deal for late payment of taxes—a crime for which Mr. Walker had never even been charged. At the time of Mr. Walker's prosecution by the federal government, Defendant Crenshaw was a new prosecutor with the AUSA.

66.     The plea of "late taxes" was based on Mr. Walker's accountant, Mr. George Baugh, stating that he had not received a certain check in time to include it in Mr. Walker's tax liability calculations. As it turns out, Mr. Walker's financial advisor, Michelle Ball, executed an affidavit and a letter to the effect that she had informed Mr. Baugh about those amounts in plenty of time for them to be included in the tax returns. Ex. 9. Be that as it may, Mr. Baugh later said he never received the information from Mr. Walker and that as a result Mr. Walker had failed to provide him with information necessary to file proper taxes, and Mr. Walker was deficient in his tax payment. Upon information and belief, Mr. Baugh was led to make those statements by the Conspiracy.

67.     Mr. Walker agreed to the plea and agreed to "repay" the supposedly late taxes. From then on, the Conspiracy—through the Beaumont Examiner, the Board of Trustees, BISD, and individuals employed by them, relentlessly smeared Mr. Walker. Members of the BISD Board of Trustees, as well as the Beaumont Examiner, repeatedly referred to Mr. Walker as having: 1)

been found guilty or plead guilty to defrauding BISD; and 2) agreeing to "repay" BISD for the money he stole. Neither statement was ever true.

### E.  The Conspiracy's Relentless Smear Campaign of Mr. Walker

#### 1.  The BISD Board of Trustees

68.     In approximately 2010, Tom Neild became a member of the BISD Board of Trustees. And in approximately 2012, Mike Neil also became a member of the Board of Trustees. From the start of each of their respective tenures, both Mr. Neil and Mr. Neild repeatedly decried the fact that Mr. Walker was providing services to BISD. Specifically, Mr. Neil and Mr. Neild repeatedly stated, in public, during open Board of Trustees meetings, as well as in private, that Mr. Walker was a "crook," that he had defrauded BISD, that he had been found criminally guilty of defrauding BISD, and that he was a thief. *See, e.g.*, M. Neil Video (posted Jul. 28, 2012), Ex. 19. These were lies. Mr. Walker had not been, and has never been, found guilty of defrauding BISD. Mr. Walker, through counsel, immediately, repeatedly, and continuously asked Mr. Neil and Mr. Neild to stop making those statements because they were not true.

69.     These statements by Mr. Neil and Mr. Neild were then echoed by members of the Conspiracy planted as members of the public. For example, on or about July 26, 2012, Defendant Getz made public comments at a BISD meeting to the effect that Mr. Walker had "admitted" to submitting "fraudulent invoices" to BISD. Exs. 17, 18 (Video & Transcript). Mr. Getz was referencing "documents" provided by the DOJ—i.e. Bob Rawls, acting as a member of the Conspiracy. *Id*. Mr. Getz accused BISD of failing in its fiduciary responsibilities if it failed to recover the "funds" that Mr. Walker had "stolen." *Id*. Finally, Mr. Getz accused the BISD Board of Trustees of being racially biased and only allowing Mr. Walker to continue working for BISD because he is black. *Id*. Audio recordings have Defendant Neil saying, about Mr. Walker, "He not

only altered the document. He submitted the document and accepted the payment." Ex. 19. Defendant Neil also made the statement that Mr. Walker had "defrauded" BISD of $3.7 million. *Id.* Defendant Neil then stated that although BISD had "received" the services, Mr. Walker had "overbilled" BISD. *Id.* Defendants Getz and Neil, as members of the Conspiracy, were furthering the Conspiracy's goals and laying the foundation for the representations that continued to take place into 2014 and 2015 regarding Mr. Walker.

70. As stated above, Mr. Walker pled guilty to a single count of paying his taxes late. Mr. Neild, Mr. Neil, and Mr. Getz were fully aware of the falsity of their statements but continued to make them to rally support against Mr. Walker and justify taking the BISD electrical services contract away from him. In order to rally this support, the Conspiracy made false statements about Mr. Walker to a number of entities, including TDLR, the Texas Education Agency (TEA), and the Texas State Comptroller of Public Accounts. The statements distributed by members of the Conspiracy were to the effect that Mr. Walker committed fraud and/or admitted to committing fraud against BISD and/or admitted to "altering an invoice" in a way that implied Mr. Walker admitted to fraud.

71. The members of the Conspiracy also used their allies at the Beaumont Examiner, the Beaumont Enterprise, SETInvestigates.com and Watchdog.com. As to the Beaumont Examiner, this is not surprising given that Defendant Wayne Reaud owns and/or controls the Beaumont Examiner, has represented IBEW 479, and is Defendant Crenshaw's godfather. Specifically, Defendant Reaud relied on Don Dodd, a Beaumont Examiner employee, to publish stories furthering the goals of the Conspiracy as to Mr. Walker.

**2. The Beaumont Examiner and Beaumont Enterprise**

72.     The Beaumont Examiner and the Beaumont Enterprise, two local newspapers, published a number of articles about Mr. Walker, parroting unfounded accusations and painting Mr. Walker as a crooked businessman out to defraud BISD.

73.     The Beaumont Examiner stoked the fire against Mr. Walker. For example, the Beaumont Examiner, in an article by Brooke Crum, stated as fact that Mr. Walker was "not required to submit a paid invoice for the materials billed to the school district. . . ." Ex. 12. This statement was entirely false. The Beaumont Examiner also cited a "signed plea agreement between Walker and the federal government wherein Walker admitted invoices submitted to BISD In order to secure payment were altered. . . ." *Id*. This statement was misleading because incomplete as well as false *per se*.

74.     As stated above, first, Mr. Walker was in fact obligated to submit detailed invoices although *no other contractor* was subjected to the same requirements. Second, there is no "signed plea agreement" to the effect that Mr. Walker defrauded BISD. But none of this was of any import to the members of the Conspiracy.

75.     The Beaumont Enterprise and some of its writers acted as partners in the Conspiracy starting in 2012. Ex. 8. In fact, in 2012, while reporting on Mr. Walker's trial, the Beaumont Enterprise announced that BISD could go after $2 million supposedly forfeited by Mr. Walker, thereby representing that Mr. Walker had defrauded BISD by that amount. *Id.* This was incorrect.

76.     On March 11, 2014, the Beaumont Enterprise published an article by Amy Moore stating, "In his plea agreement, Walker signed a statement that he knowingly altered invoices that were submitted to the school district for repayment in the amount of $2 million." Ex. 7. The plea agreement says no such thing and these are defamatory statements. The article further stated, "He

forfeited a total of $3.5 million in his plea agreement, $2 million of which the school district could

have sought." *Id*. This statement is defamatory *per se* and *per quod*. *Id*. The article also stated that

Mr. Walker "had to surrender his master electrician license after he falsified the renewal

application." *Id*. This too is false and defamatory.

77.     On July 28, 2014, Brooke Crum of the Beaumont Enterprise published another

article about Mr. Walker, stating that Mr. Walker admitted to "falsifying" invoices submitted to

BISD. Ex. 6. The statement indicated that Mr. Walker had defrauded BISD when, in fact, he did

not nor did he admit to doing so in the plea agreement signed with the AUSA.

78.     On July 30, 2014, the Beaumont Enterprise published an article stating Mr. Walker

had defrauded BISD by approximately $343,000 and that the only reason BISD was not going to

recover that money was because it "refused to say it was a victim of a crime." Ex. 5. The article

made other incomplete and/or defamatory statements about Mr. Walker. The Beaumont

Enterprise's statements were defamatory *per se* and *per quod*.

79.     On October 2, 2014, the Beaumont Enterprise published an article stating that Mr.

Walker was ordered to pay $ 2 million in restitution to BISD. Ex. 4. In that context, the Beaumont

Enterprise stated that Mr. Walker acknowledged he "altered electrical invoices presented to the

school district," and that "in exchange, he pleaded guilty to federal tax violations." Ex. 4. All of

these statements are false and defamatory.

80.     On October 15, 2014, the Beaumont Enterprise published an article to the effect

that Mr. Walker falsified a quote by a wholesaler to make it look like Walker had been invoiced

by that wholesaler. According to the Beaumont Enterprise, Mr. Walker then submitted that invoice

to BISD to receive payment for $382,975.32. Ex. 3. The article implies that Mr. Walker defrauded

BISD by that amount. The Beaumont Enterprise was quoting BISD's lawyer, Miles Bradshaw,

who spoke on BISD's behalf. In fact, Mr. Walker's plea agreement says the opposite. The purpose of including that statement in the plea agreement was *not* to indicate that BISD paid for something it did not receive. And framing it that way is defamation *per quod* in addition to defamation *per se*. The context of that statement was to explain that Mr. Walker had received income, but then had not incurred certain expenses, which means that his income was higher and therefore he owed taxes on that amount. Interestingly, in that same article, Mr. Bradshaw also stated that the Evaluation Matrix used by BISD should have said that, "Walker admitted to altering a quote from a wholesaler for $382,975.32 to make it reflect an invoice, which BISD paid." *Id*. The Evaluation Matrix does not say this.

81.     On October 25, 2012, the Beaumont Examiner published an article called "BISD board foregoes Walker funds." Ex. 2. In that article, the Beaumont Examiner stated that Mr. Walker "admitted to falsifying invoices submitted to the school district for payment." *Id*. The article also stated Mr. Walker had agreed to forfeit $3.2 million in assets, implying he had defrauded BISD by that amount, which was not true, and improperly bolstered the Conspiracy's tale of Mr. Walker's guilt. *Id*.[1] When the BISD refused to take the supposedly "forfeited" funds at an October meeting, Mr. Neild strenuously objected. The Beaumont Examiner article quotes him as stating that BISD had to find a way to "get[] back [its] funds." *Id*. As stated above, these funds were neither forfeited, nor were they BISD's, given that Mr. Walker never admitted to, nor was he convicted of, defrauding BISD.

### 3.  SETInvestigates.com

---

[1] Mr. Walker agreed to "repay" his taxes; and the Government initially told him that his payment would amount to $3.2 million. The Government then revised its estimate. The Beaumont Examiner, and its agents, improperly used that number to state that Mr. Walker was going to "forfeit" that amount which implied guilt of fraud against BISD.

82.     As a member of the Conspiracy, Jerry Jordan wrote for SETInvestigates, engaging in overt acts in furtherance of the RICO Conspiracy and civil conspiracy. For example, Defendant Jordan claimed as fact that Mr. Walker stole "millions from [BISD]." Ex. 28. Jerry Jordan further stated as fact that Mr. Walker forfeited "millions of dollars obtained by scamming public entities – specifically BISD - . . . ." *Id*. at 1. Not surprisingly, Defendant Jordan interviewed Defendant Neil, BISD Trustee, to the effect that, "[Mr. Walker] stole from us and he admitted it in the statement he signed." *Id*. at 2. Of course, that statement was repeated numerous times by Jerry Jordan. *See, e.g.*, Ex. 29 (stating that Mr. Walker "later admitted in a signed affidavit to defrauding the Beaumont Independent School District out of millions of dollars . . . ."). A number of similar statements were published into 2013. *See* Ex. 30 at 1-12 ("Now, Walker has admitted the he not only overbilled BISD but he also tried to dodge paying taxes on the money—kind of a double dip when you think about it, being paid with taxpayers' money and then not paying taxes on the income.").

83.     In early 2013, Defendant Neil gave another interview to Defendant Jordan for SETInvestigates.com. The context of the interview was that Mr. Walker had filed a complaint against Defendant Neil for not abstaining from a vote on a contract that posed a conflict of interest for Defendant Neil. According to Defendant Jordan, who vehemently defended Defendant Neil against Mr. Walker, the "video" of the vote showed that Defendant Neil had in fact abstained. When interviewed, Mr. Walker responded that the minutes of the meeting showed Defendant Neil voting in favor of the contract at issue. Defendant Neil responded the minutes were incorrect. Defendant Neil added, "Looking at it right now, I may have violated the law by not signing the affidavit but I will put up my not signing an affidavit against him [Mr. Walker] stealing $3.7 million. If not signing an affidavit makes me a piece of shit, I don't know what [that] [sic] makes

him for taking $3.7 million." *Id.* at 12. Defendant Neil asked if that was going to be censored. He was informed the interview was live. Defendant Neil supposedly chuckled and added, "Good. 'Calvin, if you are listening, you can kiss my ass.'" *Id.*

### 4.   Watchdog.org – Jon Cassidy

84.     Another outlet for IBEW Agents', BISD Agents', and the Conspiracy was Jon Cassidy's "Watchdog.org." For example, in April 2013, Defendant Cassidy published an article titled, "Man fakes six-figure invoice, keeps job with TX school district." Ex. 31. The first line of the article stated, "How many six-figure invoices does a guy have to fake to get fired around here?" *Id*. The article went on to make the usual false statements that Mr. Walker had "admitted to collecting $382,975.32 on a phony invoice." *Id*. Defendant Cassidy went on to rail against the Board of Trustees who decided not to interrupt BISD's contract with Mr. Walker, stating that their race made them immune from getting removed from office and identifying the Voting Rights Act as the root of this evil, "Normally, that sort of treachery gets a board trustee ejected from office, and fast, but in Beaumont, the four trustees have little to fear from an outraged electorate thanks to their race, which matters more to one federal official than a long list of abuses of the public's trust and money. You could say it matters more than democracy itself, and has since 1965, when Section 5 of the Voting Rights Act gave the U.S. Department of Justice authority over elections procedures across the South." *Id.*

85.     In that same article, Defendant Cassidy reported that Defendant Hermann, a local electrician (and as explained above, an IBEW member) reported Mr. Walker to the FBI. Ex. 31. This is yet another overt act in the Conspiracy's activities.

86.     On July 31, 2014, Defendant Cassidy wrote another article about Mr. Walker. He, again, repeated that Mr. Walker "admitted submitting fake six-figure invoices. . . ." Ex. 11. In that

article, Defendant Cassidy discussed an array of topics, including the Justice Department's work "against the voters of Beaumont," through the Civil Rights Division which, according to Defendant Cassidy blocked "an election of the school board, which might have affected the racial makeup of the board of directors." *Id*. Defendant Cassidy in another article explained that the Civil Rights Division was blocking the election because it would "endanger the four black members in the majority." Ex. 10. Defendant Cassidy's racial animus was reflective of the Conspiracy's similarly racially based motivations.

### F.  IBEW Agents Enlists BISD and its Acolytes—the Conspiracy—to Interfere with Mr. Walker's BISD Contract.

87. In July 2014, BISD Trustee Defendant Neil, upon learning that Mr. Walker would not go to jail and was not found guilty of defrauding BISD, fumed at the outcome and, especially, fumed at statements reminding the public Mr. Walker was not guilty of fraud. For example, Ms. Haynes, BISD's Communications Director, issued a press release to the effect that Mr. Walker had reached a plea agreement and that Mr. Walker would receive "no jail time." Ex. 27 at 2. Defendant Neil, according to reporters, was "none-to-happy" about Ms. Haynes' pronouncement. Ex. 27. Ms. Haynes is an African-American woman. Defendant Neil (or Defendant Neild) first accused Ms. Haynes of lying, "It is just another blatant lie put out by our communications director." *Id*. at 2. Defendant added that he had "spoken to the Department of Justice," (presumably Defendant Crenshaw, Bales or one of their acolytes), and that "it is up to the judge as to whether [Mr. Walker] serves time in prison." *Id*. at 2. Defendant then added that Ms. Haynes, an African-American woman, did not have the intellectual capacity to understand the situation, "it is a lot more serious than I guess she has the comprehension for." *Id*. Defendant Neil then added that despite the mistrial, he would seek to have Mr. Walker's contract canceled because the, "[t]his is not over with regards to BISD as far as I am concerned." *Id*.

88.     Unhappy about their inability to stop Mr. Walker from continuing to serve BISD, and earn a living in defiance of IBEW 479's membership, members of the Conspiracy instructed BISD to stop giving Mr. Walker any work. As a result, for the last few months of the Contract, and despite the fact BISD needed electrical repairs and maintenance, BISD employees were ordered to halt using Mr. Walker even though he was BISD's contractor. This was in violation of the Contract and, because of the bases for giving the instructions, was in furtherance of a conspiracy to deprive Mr. Walker of the benefits of the Contract, as well as a deprivation of Mr. Walker's right to equal protection of the laws.

89.     Later in 2014, the Board of Trustees was replaced with a Board of Managers. The Board of Managers was composed of Dr. Venice Monroe, A.B. Bernard, Jimmy Simmons, Robert Turner, Joe Domino, Lenny Cabarello, and Jack Carroll. The Board of Managers made the decision to not renew the Contract. The Board of Managers also improperly terminated the Contract.

90.     As Walker's contract with BISD was reaching the end of its fourth year and was up for renewal, rather than extend his contract for its last year, BISD put out a bid request seeking another contractor. In previous years, Mr. Walker had received a notice between May and July of each year informing him of BISD's intention to continue the contract. However, in 2014, Walker received no such notice nor did he receive a notice terminating the Contract. Because Walker did not receive a notice of termination, Mr. Walker turned down several lucrative contracts. Among them, a 1-year contract with Northwest ISD Dallas for $500,000. BISD's actions with respect to the Contract were a breach of contract, were in furtherance of the RICO and civil conspiracies, and because they were at least in part, if not wholly, based on racial animus, a deprivation of Mr. Walker's constitutional rights.

**G.  BISD's Pretextual Refusal to Award the Contract to Mr. Walker in 2014.**

91.     In 2014, BISD awarded the Contract for providing electrical maintenance and repair services to a company other than one associated with and/or owned by Mr. Walker. In doing so, BISD based its award on a number of factors summarized in an "Evaluation Matrix." Ex. 23. In that chart, it is evident that each contractor was awarded a number of points based on certain categories, including "References." Under Walker's Electric "References" BISD stated, "District's Previous Provider Admitted guilt to padding BISD invoices. Paid back over $2,000,000." *Id*. Neither of those statements is true. As a result of this, Mr. Walker received a score of 0% for "References." His total score was 50%, making him one of the lowest two ranked bidders. The individuals responsible for preparing the Evaluation Matrix were Leroy Saleme, current CFO of BISD, Aaron Covington, Purchasing Director, and Vernon Butler, Superintendent.

92.     As stated above, Mr. Walker *never* plead guilty nor was he ever found guilty of "padding" invoices to BISD. BISD's use of such defamatory statements, through the actions of its employees, is both an injury in itself and a continued defamation of Mr. Walker's and Walker's Electric reputation. These actions are also a violation of Mr. Walker's civil rights and overt acts in furtherance of a conspiracy. Indeed, BISD's repeated statements regarding Mr. Walker's guilt, through its Evaluation Matrix which was available online and through media outlets such as the Beaumont Examiner, caused Mr. Walker to lose substantial business. The Evaluation Matrix is still available online.[2]

93.     Walker lost the following business opportunities:

   a.   Work to be performed for DCP Midstream for a value to be determined at trial (Ex. 24);

---

[2]

https://beaumontisdtx.ionwave.net/PublicList.aspx?company=beaumontisdtx&show=detail&bid=62&pg=0&ret=AWAR&cf=1%3a%3a%3a!!!2%3a%3a%3aElectrical!!!3%3a%3a%3a

> b.  A five-year contract with the Dickerson Group, Inc. for $20 million (Ex. 20);
>
> c.  An Electrical Inspector position in Houston, Texas, consisting of a permanent position for $75,000/year;
>
> d.  An Electrical Inspector position in Baytown, Texas consisting of a permanent position for $65,000/year (Ex. 21); and
>
> e.  A contract with Bennett Electric for approximately $ 2 million (Ex. 26).

In fact, BISD had in its possession glowing letters of recommendation from Dr. Carroll Thomas, the former Superintendent. Ex. 22.

94.     The Evaluation Matrix also reflects that BISD, through its agents identified above, also fabricated reasons to give Walker a low score by: 1) stating that Walker's insurance was deficient; and 2) improperly awarding points for employees/subcontractors available to perform the work. Ex. 23 at 3. Had Walker been graded appropriately, he would have received a score towards the top of the group, making him eligible to receive the Contract. The Conspiracy's inclusion of negative references in the Evaluation Matrix was based on lies, and was done knowingly or at the very least recklessly. Further, the Conspiracy's intentional miscalculation of Walker's score (which included improper allocation of points for experience, capabilities, and past performance) was premised on racial bias and in furtherance of the Conspiracy's goals, and a deprivation of Mr. Walker's civil rights. These actions were also in furtherance of the Conspiracy's racketeering activities against Mr. Walker as punishment for his refusal to "fall in line" and his continued success as an electrician.

### H.  BISD's Targeting of Minority Employees and Vendors

95.     Prior to 2012, Mr. Neil, Mr. Neild, as well as other members of the Board of Trustees, acting on behalf of the Conspiracy, engaged in the practice of requesting documents

relating to, or about, African-American employees and/or BISD vendors from the BISD's Office of the Superintendent. The documents would then be turned over by the Conspiracy to the Beaumont Examiner, or other media outlet, and articles regarding these individuals would then appear in the Beaumont Examiner or other media outlet with a number of inflammatory headlines. One such example is a July 2, 2013, article regarding a $7330.02 invoice Mr. Walker submitted for allegedly running "a few feet" of wire and "install[ing] and outlet." Ex. 16. The article appears to have no other purpose but the defamation of Walker. Not surprisingly, Defendant Neil was quoted in the article claiming that the job could be done "in an hour with a ladder." *Id*. Defendant Neil then added, "[Mr. Walker] continues to defraud the district by overbilling for his work." *Id*. These statements were in furtherance of the conspiracy. In 2012, Dr. Thomas retired as Superintendent of BISD. At that point, this practice kicked into high gear.

96.     The Conspiracy, through Mr. Neil and Mr. Neild, as well as other members of the Board of Trustees, began to request copious documentation about individuals such as Melody Chappell, a BISD lawyer, Mr. Walker, Mr. Gayle Botley, a BISD auditor, and others. The common trait of these individuals was their race. In addition, the Conspiracy—specifically Mr. Neil and Mr. Neild, among others—would request documentation about African-American BISD employees who had attended the Texas Alliance of Black School Educators meetings. Such requests were never made for white participants at the TABSE meetings or of other white BISD employees. Such document requests were so onerous that they interfered with BISD's every day operations.

**I.   The Joint Task Force.**

97.     On January 9, 2014—two years after Mr. Walker was acquitted—Defendant Malcolm Bales, US Attorney's Office, in an unrelated press conference, referred to Mr. Walker's mistrial. Specifically, Defendant Bales referred to the racial polarization created by Mr. Walker's

indictment. Ex. 14. Two weeks after this particular press conference, Defendant Crenshaw was sworn in as Jefferson County District Attorney. A little over one month after that, Defendants Crenshaw and Bales announced the formation of a "joint task force." Ex. 15. Defendant Crenshaw was then sworn in as a Special Assistant United States Attorney of the USAO on May 12, 2014 to "assist with Joint Task Force Cases." Defendant Crenshaw was specifically appointed to "report to and act under" Defendant Bales. Defendant Crenshaw's involvement in the prosecution of Mr. Walker is not surprising. Defendant Wayne Reaud, owner of Beaumont Examiner and the IBEW's lawyer, is also the godparent of Defendant Crenshaw.

98.     Two months after the creation of the task force, the State of Texas filed a case against Mr. Walker. The case against Mr. Walker was developed largely on facts the State already had available in 2012 when it was unable to secure a conviction of Mr. Walker. Further, the task force appears to have been created for the sole purpose of investigating and indicting Mr. Walker. Mr. Walker's indictment is fueled by racial animus and is a violation of his rights to due process and equal protection of the laws. Indeed, in an April 22, 2014, email from Defendant Crenshaw to Defendant Bales, Defendant Bales told his former subordinate, "I have seen Calvin's manifesto. His criminality is only outstripped by his hubris." Ex. 13. Defendant Bales promised Defendant Crenshaw his assistance, "We can provide you information developed in the federal investigation." *Id*. But he noted, "We are only constrained from actively participating in any subsequent state prosecution-no strategy meetings, witness preparation, additional federal grand jury work, for example." *Id*. However, Defendant Bales cautioned Defendant Crenshaw to cover his tracks, "you should not refer to the any [sic] Walker case that I generated from the DA's office as part of the work of the joint task force." *Id*.

99.     Shortly thereafter, the Jefferson County DA's office also filed charges against a certain Naomi Lee-Lawrence, BISD's former head of procurement, who had testified in Mr. Walker's favor at his federal trial to the effect that Mr. Walker had not defrauded BISD. That indictment is still pending.

100.     Defendant Bales and Defendant Crenshaw, in their official capacity, deprived Mr. Walker of due process of the law and equal protection of the laws. Defendants Bales and Crenshaw, in their individual capacities participated in the conspiracy to defame Mr. Walker, interfere with current and future business prospects, and deprivation of equal protection of the laws by BISD. Defendants Bales and Crenshaw also participated in the RICO Conspiracy and civil conspiracy to further the Conspiracy's goals.

## VI.   CLAIMS

### A.  Claim One – Defamation Per Se – Libel

101.     Agents    of    the    Beaumont    Examiner,    the    Beaumont    Enterprise, SETInvestigates.com, and Watchdog.org published statements to the effect that Calvin Walker had admitted to defrauding BISD, had admitted to altering invoices, had forfeited funds owed to BISD, owed money to BISD, is a crook, a thief, is a poor business man, is a sloppy record keeper, and other statements described above;

102.     These statements were defamatory *per se* concerning Walker;

103.     The members of the Conspiracy making such statements acted with actual malice, knowledge, negligence and/or recklessness as to the truth of those statements.

104.     Walker repeatedly asked members of the Conspiracy making defamatory statements to cease and desist from making such false statements and those members of the Conspiracy failed to retract, correct, or clarify the statements.

### B. Claim Two-Defamation Per Quod - Libel

105.    Agents of the Beaumont Examiner, the Beaumont Enterprise, SETInvestigates.com, and Watchdog.org published statements to the effect that Calvin Walker had admitted to defrauding BISD, had admitted to altering invoices, had forfeited funds owed to BISD, owed money to BISD, is a crook, a thief, is a poor business man, is a sloppy recordkeeper, and other statements described above;

106.    These statements were defamatory *per quod* concerning Walker;

107.    The members of the Conspiracy making such statements acted with actual malice, knowledge, negligence and/or recklessness as to the truth of those statements;

108.    Walker repeatedly asked members of the Conspiracy making defamatory statements to cease and desist from making such false statements and those members of the Conspiracy failed to retract, correct, or clarify the statements.

### C. Claim Three: Defamation Per Se – Slander

109.    Members of the Conspiracy made oral statements to the effect that Calvin Walker had admitted to defrauding BISD, had admitted to altering invoices, had forfeited funds owed to BISD, owed money to BISD, is a crook, a thief, is a poor business man, is a sloppy record keeper, and other statements described above;

110.    These statements were defamatory *per se* concerning Walker;

111.    The members of the Conspiracy making such statements acted with actual malice, knowledge, negligence and/or recklessness as to the truth of those statements.

112.    Walker repeatedly asked members of the Conspiracy making defamatory statements to cease and desist from making such false statements and those members of the Conspiracy failed to retract, correct, or clarify the statements.

### D.  Claim Four: Defamation Per Quod – Slander

113.    Members of the Conspiracy made oral statements to the effect that Calvin Walker had admitted to defrauding BISD, had admitted to altering invoices, had forfeited funds owed to BISD, owed money to BISD, is a crook, a thief, is a poor business man, is a sloppy record keeper, and other statements described above;

114.    These statements were defamatory *per quod* concerning Walker;

115.    The members of the Conspiracy making such statements acted with actual malice, knowledge, negligence and/or recklessness as to the truth of those statements.

116.    Walker repeatedly asked members of the Conspiracy making defamatory statements to cease and desist from making such false statements and those members of the Conspiracy failed to retract, correct, or clarify the statements.

### E.  Interference With Existing Contract

117.    Walker's Electric and/or Calvin Walker and/or Walkers Electric had a contract with BISD;

118.    There was a willful and intentional act of interference by the Conspiracy, excepting BISD itself; and

119.    The Conspiracy's intentional act of interference, (excepting BISD) was a proximate cause of actual damages to Calvin Walker and Walker's Electric.

### F.  Interference With Prospective Contract

120.    There is a "reasonable probability" that Walker's Electric and Calvin Walker would have entered into a prospective relationship or contract with the entities identified above;

121.    An independently tortious or wrongful act by members of the Conspiracy prevented the relationship from occurring;

122.    The members of the Conspiracy did such act with a conscious desire to prevent the relationship from occurring, or knew the interference was certain or substantially certain to occur as a result of the conduct of the Conspiracy's members; and

123.    Calvin Walker and Walker's Electric suffered actual harm or damage as a result of interference by members of the Conspiracy.

### G.  Breach of Contract

124.    There was a valid contract between BISD and Calvin Walker/Walker's Electric/Walkers Electric;

125.    Calvin Walker performed or tendered performance according to the terms of the contract;

126.    BISD breached the contract by failing to adequately notify Mr. Walker of termination, as well as violations of the terms of the contract; and

127.    Calvin Walker/Walker's Electric sustained damages as a result of the breach.

### H.  Section 1983 Civil Rights Violation - BISD

128.    BISD Agents acted under color of state law;

129.    BISD Agents engaged in conduct that deprived Calvin Walker of rights, privileges, or immunities granted under federal law, the Texas Constitution, and the U.S. Constitution, in that BISD deprived Calvin Walker of equal protections of the laws under the 14th Amendment of the Constitution.

130.    BISD and BISD's employees in their official capacity violated Mr. Walker's rights on the basis of his race.

131.    BISD and BISD's employees in their official capacity violated Mr. Walker's rights by discriminating against him on the basis of individual attributes.

132.     BISD and BISD's employees violated Mr. Walker's rights by discriminating against him on the basis of his refusal to join IBEW.

133.     Such deprivation of rights resulted in damages to Mr. Walker.

### I.   Civil Conspiracy

134.     Members of the Conspiracy entered into a combination of two or more persons;

135.     The objectives of the Conspiracy were libel, slander, interference with current and prospective contracts, violation of Mr. Walker's civil rights, discrimination against Mr. Walker based on race, extortion, witness tampering, and interference with Mr. Walker's business, among others as described above;

136.     The objectives of the Conspiracy were to be accomplished for an unlawful purpose or a lawful purpose by unlawful means;

137.     A meeting of minds on the object or course of action;

138.     Members of the Conspiracy engaged in one or more unlawful, overt acts; and

139.     Damages were the proximate result.

### J.   RICO Violations under 18 U.S.C. § 1962(a) – IBEW Agents - Racketeering

140.     IBEW, through its local union IBEW 479 and its members (collectively, IBEW Agents), subjected Walker to repercussions as punishment for his failure to join the union. Such repercussions included defamation, interference with prospective contracts, interference with current contracts, and interference with Mr. Walker's lawful business activities, among others, as described above. In order to enact those repercussions, IBEW engaged in actual or threatened extortion, actual or threatened witness tampering, and/or actual or threatened retaliation against a witness, victim, or informant.

141.    IBEW Agents, independently and in conjunction with individuals employed by BISD and serving on the BISD Board of Trustee and Board of Managers, operated as an enterprise as that term is defined by RICO and case law (the Enterprise).

142.    IBEW, through its local union IBEW 479 and its members, identified above, engaged in racketeering activity by threatening Walker with repercussions for failure to join the union and for obtaining BISD contracts.

143.    IBEW is a national organization making use of interstate transportation and interstate means of communication. The Enterprise's activities benefited IBEW, a national organization. IBEW and IBEW 479 derived income from their pattern of racketeering activity, including member dues and capturing business that but for the racketeering, would have gone to non-IBEW entities and individuals, such as Mr. Walker. Such income was earned making use of interstate wires and interstate methods of communication.

### K.  RICO Violations under 18 U.S.C. § 1962(a) – BISD Agents – Racketeering

144.    BISD employees and members of the BISD Board of Trustees identified in this Complaint (BISD Agents) were public servants at all relevant times.

145.    BISD Agents engaged in an enterprise to further racketeering activities with IBEW Agents and independently.

146.    BISD Agents engaged in racketeering activities by misusing official information in violation of Tex. Penal Code Section 39.06 and engaging in official oppression in violation of Tex. Penal Code Section 39.03. Such violations are punishable as felonies under certain circumstances. Such circumstances exist in this case.

147.    BISD Agents engaged in racketeering activities to intimidate and damage Walker. BISD Agents used interstate commerce, including interstate means of communications to further the racketeering activities.

148.    Walker was damaged by BISD Agents' activities.

### L.  RICO Violations 18 U.S.C. § 1962(c) – Conspiracy

149.    Members of the Conspiracy, by their words and/or actions, objectively manifested an agreement to participate, directly or indirectly, in the affairs of the Enterprise through the commission of two or more predicate acts.

150.    Members of the Conspiracy did, in fact, engage in the affairs of the Enterprise by assisting in activities that damaged Walker, namely: spurious complaints with the TDLR, defamation, interference with prospective contracts, interference with current contracts, interference with Mr. Walker's business, and other actions described above. Members of the Conspiracy also agreed to take actions in violation of state and federal law to further the Enterprise's goals.

151.    Walker was damaged by the Conspiracy's activities.

## VII.    DAMAGES

152.    Walker seeks actual damages for breach of contract, totaling $300,000;

153.    Walker seeks actual damages for the defamation, totaling at least $22 million, the actual amount to be proven at trial;

154.    Mr. Walker seeks to recover for the violation of his civil rights under the US Constitution;

155.    Walker seeks exemplary damages;

156.    Walker seeks treble damages;

157.    Walker seeks attorney's fees and costs;

158.    Walker seeks interest;

159.    Walker seeks injunctive relief so that each member of the Conspiracy issue an unequivocal retraction, correction, and/or clarification as to Walker relationship with BISD;

160.    Walker seeks any other relief to which they are entitled in law or in equity.

*/s/ Maria-Vittoria "Giugi" Carminati*
Maria-Vittoria "Giugi" Carminati
SBN: 24065007
**CARMINATI LAW PLLC**
917 Franklin Street, 4th Floor
Houston, TX 77002
Direct: 281.826.9552
Email: Giugi@CarminatiLaw.com
**LEAD ATTORNEY FOR PLAINTIFFS
CALVIN WALKER, WALKER'S
ELECTRIC, AND WALKERS
ELECTRIC**